| | |
|---|---|
| JOSEPH MICHAEL CARILLI,<br>*Plaintiff*, | |
| v. | No. 3:19-cv-01922 (JAM) |
| SCOTT SEMPLE *et al.*,<br>*Defendants*. | |

## THIRD INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Joseph Michael Carilli is a prisoner in the custody of the Connecticut

Department of Correction ("DOC"). He has filed a third amended complaint with the help of

appointed counsel and *in forma pauperis* under 42 U.S.C. § 1983.[1] Carilli alleges that defendants

violated his Eighth Amendment rights by delaying and denying medical care, and he alleges that

they violated his Fourteenth Amendment rights by depriving him of procedural due process in

responding to his complaints and grievances regarding that inadequate medical care. After a third

initial review, I conclude that Carilli's claims under the Eighth Amendment may proceed in part

against certain defendants.

### BACKGROUND

Carilli names twenty defendants: former DOC Commissioner Scott Semple (from 2014 to

2018); former DOC Commissioner Rollin Cook (from 2019 to 2020); current DOC

Commissioner Angel Quiros (from 2020 to the present); Richard Furey; Dr. Joseph Breton; Dr.

Byron Kennedy; Colleen Gallagher; Dr. Mahboob Ashraf; Nigel Rodney; Dr. Johnny Wright;

---

[1] The Court expresses its great appreciation to attorney Sarah Steinfeld of the law firm of Koskoff, Koskoff & Bieder, P.C. for her assistance in the drafting and re-filing of an intelligible complaint. *See also Carilli v. Semple*, 2020 WL 2097741, at *1 (D. Conn. 2020) (discussing prolix and confusing allegations of Carilli's initial complaint).

Andrew Fuller; Juanita Scott; Maria Bianchi; Dr. Carson Wright; Hannah Sullivan; Michelle Cyr; Dr. Cary Freston; Tim Bombard; Sandra Charles; and Shannon Beckford.[2] Semple, Cook, Quiros, Furey, Dr. Breton, Dr. Kennedy, and Gallagher are sued in their individual and official capacities for some claims, while the remaining defendants appear to be sued in their individual capacities.[3] The events underlying this action occurred while Carilli was housed at Osborn Correctional Institution ("Osborn").[4]

The following facts are alleged in the complaint and are accepted as true for purposes of initial review only. Carilli begins his complaint by explaining the process of medical treatment at the DOC. According to Carilli, prior to 2019, the "chain of command for medical requests worked through the Utilization Review Committee ("URC")."[5] Under this system, a treating provider seeking approval for a recommended treatment would write a request to the URC, and if the URC rejected the request, either the treating provider or the inmate could appeal.[6] Carilli believes that URC requests "for valid medical requests were routinely turned down for no legitimate medical reasons."[7] Carilli alleges in particular that defendant Dr. Breton has criticized the URC system on a number of occasions.[8]

Beginning sometime in early 2019, the DOC instituted a new system called the Patient Priority and Transportation Process ("PPT"), replacing the URC system, although many at DOC continued to refer to this new system as the URC.[9] Carilli alleges that the PPT system has still

---

[2] Doc. #33 at 45-50 (¶¶ 208-33).
[3] *Id.* at 3, 7-9 (¶¶ 11-13, 33-34, 39).
[4] *Id.* at 1, 3 (¶ 10).
[5] *Id.* at 9 (¶ 42).
[6] *Id.* at 9 (¶ 43).
[7] *Id.* at 9 (¶ 44).
[8] *Id.* at 10 (¶¶ 46-48).
[9] *Id.* at 10 (¶ 51).

2

resulted in "unacceptably long waits, delays, and bureaucracy for inmates to navigate in order to have any hope of accessing adequate medical care."[10] Administrative Directives ("ADs") provide the processes and procedures by which inmates can file requests, grievances, and appeals in regards to their treatment.[11]

In 1988, Carilli sustained a back injury while working as a truck driver, and he was diagnosed with spondylolisthesis with spondylolysis, a "stress fracture that causes bones in the spine to slip, affecting the spinal nerves."[12] This condition required Carilli to undergo three spinal fusion surgeries on his lumbar spine in the 1990s.[13] Carilli continues to experience chronic back pain and requires medication to treat it.[14]

Carilli was incarcerated in February 2013, and he was transferred to Garner Correctional Institution ("Garner") in the middle of 2014.[15] After telling DOC staff that he suffered from constant back pain, Carilli was referred for a neurological examination.[16] On June 29, 2015, a neurologist at University of Connecticut ("UConn") Health performed an electroneuromyography ("EMG") study to "assess how [Carilli's] nerves were carrying electrical signals."[17] The neurologist's records stated that Carilli "presents with constant lower back and Left lower extremity pain as well as numbness and tingling in toes."[18] The EMG study revealed "evidence for chronic left L5 and S1 radiculopathy," a condition "whereby nerves are

---

[10] *Id.* at 10 (¶ 52).
[11] *Id.* at 11-13.
[12] *Id.* at 13 (¶ 59).
[13] *Ibid.*
[14] *Ibid.*
[15] *Id.* at 13 (¶ 60).
[16] *Id.* at 13 (¶ 61).
[17] *Id.* at 13-14 (¶ 62).
[18] *Ibid.*

compressed in the 5th vertebra in the lumbar region of the spine and the first vertebra in the sacral region, both in the lower back."[19]

On October 15, 2015, Carilli filed an Inmate Request Form ("IRF"), requesting an MRI of his back, left knee, and right tibia/fibula.[20] An MRI, performed on March 11, 2016, showed "multilevel spinal canal and neural foraminal stenosis," and noted that "Disc bulge abuts the exiting left L5 nerve root."[21] On October 22, 2015, Nurse Eileen Law referred Carilli to a physician for an evaluation and consult.[22] While incarcerated, Carilli was given a series of steroid injections in his spine to treat pain he characterized as a "constant 6-8" on a scale of 1-10, but nevertheless, Carilli continued to suffer from back pain.[23]

At the end of 2015, Carilli was prescribed a number of medications and treatments for his back pain, including 150 mg of Lyrica twice a day; muscle rubs; 500 mg of Naproxen twice a day; and 125 mg of Elavil every night.[24] Around February 2016, Carilli was also prescribed the muscle relaxer Baclofen and additional medications for the pain.[25] In March 2016, Carilli was prescribed Tylenol with codeine ("Tylenol #3").[26]

On March 31, 2016, the URC reviewed Dr. Gerald Valetta's request to refer Carilli for a neurosurgical consult for "his diagnosed discopathy—degeneration of the cartilage discs cushioning the spinal vertebra—and chronic radiculopathy—inflammation and injury of spinal

---

[19] *Ibid.*
[20] *Id.* at 14 (¶ 63).
[21] *Id.* at 15 (¶ 66).
[22] *Ibid.*
[23] *Id.* at 14 (¶ 64).
[24] *Id.* at 14 (¶ 65).
[25] *Ibid.*
[26] *Ibid.*

nerves."[27] The URC record states that Carilli had a body-mass index ("BMI") of 39 and described the medications he had been prescribed for the back pain.[28] The URC subsequently denied the request for a neurosurgical consultation, recommending that Carilli instead receive an additional epidural steroid injection for the pain.[29] The URC approved an additional injection on April 17, 2016,[30] and Carilli received the injection on June 10, 2016.[31]

In August 2016, Carilli was transferred from Garner to Osborn.[32] Soon after Carilli arrived at Osborn, he began filing IRFs with complaints about back, knee, and ankle pain and swelling in his lower extremities, along with requests for a doctor to review his medication regimen and conditions.[33]

### Requests for referrals to specialists

The first set of Carilli's allegations deal with his continued requests for referrals to specialists for various conditions and the defendants' alleged delays and failures in scheduling appointments with these specialists and providing Carilli with adequate medical care for his pain.

On December 7, 2016, Carilli complained of "10/10 pain despite [L]yrica and Tylenol #3."[34] When his most recent steroid injection did not improve his pain, Carilli was approved to attend a consultation with a UConn Correctional Managed Health Care ("CMHC") neurosurgeon to assess Carilli's diagnosed "musculoskeletal disorder."[35] On December 9, 2016, Carilli was

---

[27] *Id.* at 14-15 (¶ 67).
[28] *Ibid.*
[29] *Ibid.*
[30] The amended complaint states that the committee approval for the additional injection came on "April 17, 2017," but in the context of the complaint, I read this approval as coming on April 17, 2016.
[31] Doc. #33 at 15 at (¶¶ 68-69).
[32] *Id.* at 15 (¶ 70).
[33] *Id.* at 15 (¶ 71).
[34] *Id.* at 15 (¶ 72).
[35] *Ibid.*

examined by a UConn CMHC neurosurgeon, who documented Carilli's complaints of pain but found Carilli was "not [a] surgical candidate at this time" because Carilli's BMI was 43, which exceeded the recommended maximum of 35.[36]

On March 11, 2017, Carilli filed an IRF with Dr. Breton, complaining of "frequency and urgency in urination" and requesting another review of his pain medication.[37] In April 2017, Carilli again filed several IRFs with Dr. Breton, with complaints of a "problem with holding urine," and a request for an additional spinal injection.[38]

On May 24, 2017, Nurse Mary Ellen Castro emailed defendant Furey, describing Carilli's medical history of multiple surgeries and spinal injections, his continued complaints of low back pain, and a legal claim Carilli had brought in which Carilli asked to see an orthopedist for "issues with his right tibia-fibula, Left knee, back, and left carpals-metacarpals" and to see a neurologist for "tremors and involuntary jerks of his hands and arms."[39]

On November 7, 2017, Carilli filed an IRF with Furey, with complaints of pain in his right ankle, back, and knee.[40]

On March 28, 2018, Carilli filed another IRF with the OCI "sick call" staff, with complaints of increasing back pain and requesting pain medication.[41]

On May 26, 2018, Carilli filed an IRF with defendant Dr. Ashraf, seeking to address a list of issues at his next medical appointment, including: "increase baclofen"; "Fill out extention

---

[36] *Id.* at 16 (¶ 73).
[37] *Id.* at 16 (¶ 74).
[38] *Id.* at 16 (¶ 75).
[39] *Id.* at 16 (¶ 76).
[40] *Id.* at 16 (¶ 77).
[41] *Id.* at 16 (¶ 78).

[sic] 1 year Lyrica—non-formulary"; ". . . [history] 3 back surgeries; 1 with hardware, spondylolisthesis with spondylolysis"; and "Right tibia/fibula, old fracture feels bone coming through skin."[42] This request was returned four days later, with an instruction for Carilli to hold onto it.[43]

On June 18, 2018, Carilli had his next "sick call" appointment with Dr. Ashraf, and Carilli gave Dr. Ashraf the IRF from May 26 with the list of issues he wanted to address.[44] Carilli asked Dr. Ashraf to evaluate the listed conditions and complained of pain resulting from those conditions.[45] But Dr. Ashraf declined to treat Carilli's complaints of pain, and instead he reduced Carilli's dose of Baclofen, a muscle relaxer.[46]

Three days later, on June 21, 2018, Carilli had another appointment with Dr. Ashraf, wherein he told Dr. Ashraf that he was experiencing pain in his left index finger and increased pain in his right ankle.[47] Carilli alleges that Dr. Ashraf did not include these complaints in his medical record and that Dr. Ashraf did nothing to address the pain in his finger and ankle.[48]

On August 2, 2018, Carilli filed another IRF with Dr. Ashraf, writing that his "left knee is swelling and very painful."[49] Carilli filed another form with Dr. Ashraf on August 17, 2018, complaining that the pain and swelling had caused "pain and edema" in Carilli's left ankle.[50] Three days later, on August 20, 2018, Carilli had another appointment with Dr. Ashraf, wherein

---

[42] *Id.* at 17 (¶ 79).
[43] *Ibid.*
[44] *Id.* at 17 (¶ 80).
[45] *Ibid.*
[46] *Ibid.*
[47] *Id.* at 17 (¶ 81).
[48] *Ibid.*
[49] *Id.* at 17 (¶ 82).
[50] *Id.* at 17 (¶ 83).

Dr. Ashraf documented Carilli's complaints of pain in his right foot and left knee, ordered an X-ray of Carilli's right foot, but did not provide any treatment for Carilli's complaints of pain in his finger or left knee.[51] Dr. Ashraf also increased Carilli's dosage of Baclofen, but Carilli alleges that he did not take any "action that would allow [Carilli] to see a specialist neurosurgeon or orthopedic specialist to treat his continued complaints of pain in his back, ankle, or knee."[52] Carilli received the X-ray of his right foot on August 23, 2018, but did not receive an X-ray of his right ankle; nor did he receive any treatment for the pain in his right tibia/fibula.[53]

On October 15, 2018, Carilli had another appointment with Dr. Ashraf, where Carilli complained about pain in his left index finger, left knee, lower back, and right ankle.[54] While Dr. Ashraf did not make a note of the left finger pain in Carilli's medical record, he did order an X-ray of Carilli's left hand to rule out a fracture.[55] That X-ray was performed on October 23, 2018.[56] The radiographer noted a "deformity" and further noted "degenerative changes involving the IP joints of the fingers with joint space narrowing"; "mild periarticular spurring''; and "mild deviation of the middle and distal phalanges of the index finger towards the ulnar aspect of the hand."[57] Dr. Ashraf signed the X-ray report on October 24, 2018.[58]

That same day, Dr. Ashraf emailed Furey, noting the "deviation" in the X-ray report, which indicated "the presence of osteoarthritis" in Carilli's left index finger.[59] The email also

---

[51] *Id.* at 18 (¶ 84).
[52] *Ibid.*
[53] *Id.* at 18 (¶ 85).
[54] *Id.* at 18 (¶ 86).
[55] *Ibid.*
[56] *Id.* at 18-19 (¶ 87).
[57] *Ibid.*
[58] *Ibid.*
[59] *Id.* at 19 (¶ 88).

stated: "After [a] certain period of time [Carilli's] knee may be replaced (knee replacement (but we don't do it here therefore he has to stay in medical treatment for [a] long time.))"[60]

On December 8, 2018, Carilli filed an IRF with Dr. Ashraf, with complaints of edema and pain in his feet and requesting an MRI of his left knee, his right tibia/fibula, and his lumbar spine "to evaluat[e] the deterioration caused over time"; a review by an orthopedic surgeon; a consultation with a neurologist; and a referral to a urologist to address what Carilli suspected to be "prostate issues."[61] On December 17, 2018, Carilli filed another IRF asking to discuss his left index finger with Dr. Ashraf.[62]

On January 7, 2019, Carilli had an appointment with Dr. Ashraf, where he asked to discuss his left index finger X-rays and treatment options.[63] Carilli alleges that during this appointment, Dr. Ashraf failed to record his complaints about his finger, although Dr. Ashraf did document Carilli's complaints of pain in his lumbar spine and lower extremities, which Carilli categorized as a "5" or "Moderate/Severe Pain."[64] However, Dr. Ashraf only kept Carilli on his current medications for the pain.[65] Carilli alleges that despite knowing about Carilli's issues with his left index finger, left knee, and right tibia/fibula, Dr. Ashraf did not discuss any further treatment options nor did he take any actions to address those issues.[66]

On February 22, 2019, Carilli had an appointment with defendant Rodney, where Carilli showed Rodney his finger and discussed his injury.[67] Carilli alleges that Rodney took no action

---

[60] *Ibid.*
[61] *Id.* at 19 (¶ 89).
[62] *Id.* at 19 (¶ 90).
[63] *Id.* at 19-20 (¶ 91).
[64] *Ibid.*
[65] *Ibid.*
[66] *Ibid.*
[67] *Id.* at 20 (¶ 92).

to address the issues with the finger or to address Carilli's complaints of pain in his back and lower extremities.[68]

On March 24, 2019, Carilli had a visit with RN Francis Morrison, who documented Carilli's complaints about his "left index finger deformity" and "noted his plan to refer [Carilli] to a physician."[69] Four days later on March 28, 2019, during an appointment with Rodney, Carilli asked what treatment he could receive for the finger, but alleges Rodney "took no medical action to treat the pain or deformity."[70]

On May 6, 2019, Carilli filed an IRF with Rodney and Furey, among others, with a request for a referral to an orthopedic specialist and neurologist.[71] On May 15, 2019, during an appointment with Rodney, Carilli reiterated the issues he had raised in the May 6 IRF, further complained of pain in his left knee, lumbar region of his back, right leg, and left index finger, and again requested a referral to an orthopedic specialist.[72] Carilli alleges that Rodney did not document these complaints of pain or the request for a referral, and further that Rodney did not "evaluate or report [Carilli's] reported increase in pain."[73]

On May 18, 2019, Carilli filed two Administrative Remedy Forms ("ARFs") in which he complained about Rodney's failure to address his complaints or his request for a referral, and again requested a referral to an orthopedic specialist and neurologist.[74] He also filed an IRF with Furey, writing, "I am in very severe pain, discomfort and stressed."[75] Carilli noted his previous

---

[68] *Ibid.*
[69] *Id.* at 20 (¶ 93).
[70] *Id.* at 20 (¶ 94).
[71] *Id.* at 20 (¶ 95).
[72] *Id.* at 20-21 (¶ 96).
[73] *Ibid.*
[74] *Id.* at 21 (¶ 97).
[75] *Id.* at 21 (¶ 98).

IRFs and wrote that Rodney had "rushed me out of his office without going over" the complaints and that Rodney had "shown no empathy for my situation concerning pain and such."[76]

On June 5, 2019, during an appointment with Rodney, Carilli said that the pain had increased and that his finger was swollen.[77] Carilli alleges that Rodney "declined to evaluate the pain and swelling" in Carilli's finger but did document "sharp, stabbing" and "constant" pain in Carilli's "back Lower left"; "radiating, shocking" and "intermittent" pain in Carilli's left leg; and "intermittent sharp pain" in Carilli's knee.[78] Rodney also noted the increase in Carilli's pain in his knee and submitted an "Ortho referral" for the knee.[79]

The next day, on June 6, 2019, defendant Cyr responded to Carilli's two ARFs from May 18, 2019, noting that an orthopedic specialist referral had been made but denying that Carilli had previously also asked for a referral to a neurologist.[80] Less than a week later, on June 12, 2019, Carilli appealed Cyr's decision with a reference to his ARF of May 6, 2019 in which he requested a "neurologist/neurosurgeon" to address his "nerve root L-5 bulge."[81] But Carilli's appeal was returned as "not appealable."[82]

In the meantime, on June 7, 2019, Carilli filed another ARF with a request to see a urologist to address his complaints of urinary incontinence.[83] Three days later, on June 10, 2019, Cyr emailed Rodney about the referral, to which Rodney replied the next day that Carilli needed

---

[76] *Ibid.*
[77] *Id.* at 21 (¶ 99).
[78] *Ibid.*
[79] *Ibid.*
[80] *Id.* at 21-22 (¶ 100).
[81] *Ibid.*
[82] *Ibid.*
[83] *Id.* at 22 (¶ 101).

to sign up for a "sick call" appointment.[84] Cyr replied to Carilli that same day telling Carilli, "you need to submit to regular sick call to be seen."[85]

That same day, Carilli filed two IRFs, one with Rodney and one with Furey, with complaints of "severe pain" to his "lumbar-sacrum area"; "severe pain on both sides of leg"; "pain, discomfort" in the left index finger, right knee, and right tibia/fibula; and urinary incontinence, and again with a request for a referral to a neurosurgeon, orthopedic specialist, and a urologist.[86] Carilli asserts that neither Rodney nor Furey took immediate action to address the issues he raised.[87] Instead, on July 3, 2019, Carilli received a response stating that no orthopedic appointment had been scheduled yet because "you have to have your follow up" with Rodney "in 2 months to re-evaluate you then . . . ."[88]

On August 1, 2019, Carilli had a medical visit with Rodney, where Carilli complained of continued pain and edema in his left index finger and against repeated his request to see an orthopedic specialist.[89] During this appointment, Rodney noted Carilli's request to "follow up with neuro surgery due to shooting pain running down his R foot," and an "upcoming appointment with [UConn] for pain."[90] Rodney did not, however, otherwise address the pain in Carilli's finger or submit a referral to a neurosurgeon.[91]

On August 14, 2019, Carilli filed an ARF asserting that Rodney had not made a decision on Carilli's request to see a neurologist, writing that, "It has been 3 years since I was evaluated.

---

[84] *Id.* at 22 (¶ 102).
[85] *Ibid.*
[86] *Id.* at 22 (¶ 103).
[87] *Ibid.*
[88] *Id.* at 22 (¶ 104).
[89] *Id.* at 22-23 (¶ 105).
[90] *Ibid.*
[91] *Ibid.*

My back needs a 4th surgery and I request an appointment with a neurosurgeon as they are the best and [sic] specialist to handle this diagnosis."[92] Carilli also wrote that "these continued delays . . . cause[] me ongoing pain."[93] That same day, after reviewing the complaint, Cyr emailed Rodney, writing that Carilli "had requested a neurology follow up due to sharp shooting pains down his R leg and spontaneous loss of grip in his right hand. Will you be submitting a [URC request] for this?"[94] Rodney responded to Cyr the next day, writing, "No URC for Neurology will be submitted at this time due to insufficient clinical data," which Cyr also included in her response to Carilli.[95]

    That same day, on August 14, 2019, Carilli filed another ARF, again requesting a referral to a urologist to address his "dribbling urine, frequent urination, [and] frequent pain [and] stiffness in lower back, hips."[96] Carilli wrote, "I began since 2015 complaining of prostate issues. I have not had an actual prostate exam or referred to a urologist."[97] On August 30, 2019, Cyr responded to Carilli, noting that Rodney had written in an email that Rodney would "need more information regarding dribbling prior to any outside referral," and that he would "see in [the] next clinic visit" with Carilli.[98]

    During the month of August in 2019, Carilli filed at least three IRFs with Rodney and Furey, in which he complained that the issues he raised in earlier complaints were ignored, while noting ongoing pain in his left index finger, right knee, back, and right leg and "dribbling of

---

[92] *Id.* at 23 (¶ 106).
[93] *Ibid.*
[94] *Id.* at 23 (¶ 107).
[95] *Ibid.*
[96] *Id.* at 23 (¶ 108).
[97] *Ibid.*
[98] *Ibid.*

urine after finish."[99] Carilli also again requested a referral to an orthopedic specialist, a neurologist, and urologist.[100] Despite Carilli's complaints and requests, defendants failed to make any referrals or schedule any specialist appointments, but instead placed Carilli on the "sick call" list and scheduled Carilli for a DOC Health Services Review.[101]

On August 28, 2019, Furey emailed Rodney, writing, "Nigel, when an inmate submits a grievance (Administrative Remedy) and Michelle Cyr forwards it to you, you have to follow up with an appointment and document it as a remedy in the EHR. Otherwise, we are at fault. Michelle [Cyr] said she forwarded 3 to you but they are writing her back saying they still have not been seen," noting that there was one grievance from Carilli.[102]

On September 6, 2019, Carilli had an appointment with Rodney in which he complained that the pain in his left index finger had worsened.[103] Despite this, Rodney did not address Carilli's pain.[104] Rodney did, however, document Carilli's urinary complaints and agreed to schedule an examination with a urologist for a digital rectal exam.[105]

On September 15, 2019, Carilli filed an IRF with Rodney, seeking an X-ray of his right ankle and asserting that Rodney had not addressed this issue during the appointment on September 6, despite Carilli noting this issue in several previous IRFs.[106]

The next day, on September 16, 2019, Carilli filed an ARF requesting an orthopedic

---

[99] *Id.* at 24 (¶ 109).
[100] *Ibid.*
[101] *Ibid.*
[102] *Id.* at 24 (¶ 110).
[103] *Id.* at 24 (¶ 111).
[104] *Ibid.*
[105] *Ibid.*
[106] *Id.* at 24 (¶ 112).

referral to treat his right tibia/fibula.[107] Cyr responded to Carilli on October 18, 2019, noting that Carilli "had an orthopedic appointment scheduled."[108]

On September 23, 2019, Carilli filed an ARF, asserting that he had not been receiving his Naproxen or Tylenol #3 as ordered by his neurosurgeon on April 6, 2016.[109] Carilli eventually received a response more than a month later that his current medication "would continue" and noting that "URC already submitted for orthopedic and neurology," which Carilli asserts meant that his requests for referrals were already submitted to the URC.[110]

On September 24, 2019, Carilli filed another IRF with Rodney, asking him to stop delaying treatment and the referral to a neurologist, and noting that Carilli had already informed Rodney about his "multiple serious medical conditions," which included "light[n]ing pain in the back of [his] right leg."[111] A month later, Rodney replied to Carilli, writing only that an appointment was set.[112]

On October 18, 2019, Carilli filed an IRF saying that he suffered from "acute onset of severe nerve injury," that he could not "stand for more than 5 minutes without shooting pain from my right foot up the back of my leg to behind my knee and in my big toe," and that he could not tie his shoes because of "stabbing pain" in his foot and leg."[113] Carilli did not receive a response until January 3, 2020, with a reply stating that an X-ray of Carilli's lumbar spine was scheduled.[114]

---

[107] *Id.* at 24-25 (¶ 113).
[108] *Ibid.*
[109] *Id.* at 25 (¶ 114).
[110] *Ibid.*
[111] *Id.* at 25 (¶ 115).
[112] *Ibid.*
[113] *Id.* at 25-26 (¶ 116).
[114] *Ibid.*

Also on October 18, 2019, Carilli filed a separate IRF in which he asked whether the UConn Health Center performed knee replacements.[115] Fuller wrote back on October 22, 2019, stating, "Yes UConn does do knee replacements. You do have an upcoming appointment with orthopedics in approx 2 months to be evaluated for your knee."[116]

A day later, on October 23, 2019, Carilli filed an ARF requesting a urology appointment, after he had heard nothing about such an appointment since Rodney had agreed to book one on September 6, 2019.[117] Cyr replied on November 22, 2019, in what Carilli alleges was a recitation of the words of defendant Scott, asking Carilli to "exercise some patience until his appointments are scheduled."[118]

On October 24, 2019, Carilli filed an IRF with defendants Furey, Rodney, Scott, Dr. Johnny Wright, Cyr, and Commissioner Cook, seeking a referral to an orthopedist, neurologist, and urologist.[119] On January 3, 2020, Carilli received a response which he alleges "indicat[ed] that he had been approved to see multiple specialists but was 'waiting for scheduling.'"[120]

On November 1, 2019, Carilli filed an IRF with Rodney complaining that the pain in his right leg was getting worse.[121] Carilli alleges that his pain was "unbearable."[122] Two days later, on November 3, 2019, Carilli filed an IRF with Scott in which he asked her to review the previous IRFs he had filed on December 8, 2018, May 6, 2019, June 19, 2019, and September

---

[115] *Id.* at 26 (¶ 117).
[116] *Ibid.*
[117] *Id.* at 26 (¶ 118).
[118] *Ibid.*
[119] *Id.* at 26 (¶ 119).
[120] *Ibid.*
[121] *Id.* at 26 (¶ 120).
[122] *Ibid.*

15, 2019 regarding the pain in his right leg.[123]

On November 6, 2019, Carilli filed an IRF with Cyr in which he asked which conditions the orthopedic and neurologist referrals had been made for—his left knee, his right leg, his left index finger, or his back—and whether these referrals had been approved.[124] Cyr responded two weeks later that Carilli's complaints were "being worked on" and asking Carilli to be patient.[125]

The next day, on November 7, 2019, during an appointment with Scott, Scott agreed to submit a referral to an orthopedic specialist for the pain in Carilli's left index finger.[126] During this appointment, Carilli also raised the prostate issues and the urology appointment Rodney had previously mentioned.[127] Carilli asserts that Scott did not address those issues.[128] A day later, on November 8, 2019, Carilli filed an IRF with Scott, stating that there had not been enough time during the November 7 appointment to address all of his issues, and described those issues, including restoration of certain pain medications; "significant stabbing pain" in his right leg; and the urology appointment he had not yet had.[129] Carilli also asked whether the orthopedic referral was approved to also treat his right leg, left index finger, and back, in addition to his left knee, but received no response.[130] Carilli filed a similar IRF with Scott on November 14, 2019.[131] And on November 19, 2019, during another appointment with Scott, Carilli complained of pain in his right leg and urinary frequency, and again asked for a urology referral.[132] That same day, Scott

---

[123] *Id.* at 26 (¶ 121).
[124] *Id.* at 27 (¶ 122).
[125] *Ibid.*
[126] *Id.* at 27 (¶ 123).
[127] *Ibid.*
[128] *Ibid.*
[129] *Id.* at 27 (¶ 124).
[130] *Ibid.*
[131] *Id.* at 27 (¶ 125).
[132] *Id.* at 28 (¶ 126).

told Fuller to document Carilli's "URC (PPT)" requests to include an orthopedic referral for Carilli's left index finger, right tibia/fibula, and back, in addition to his left knee.[133]

On December 1, 2019, Carilli filed an ARF again requesting that a urology appointment be scheduled.[134] Less than a week later, on December 7, 2019, Carilli filed an IRF with Scott, again reiterating his request for a urologist and his difficulty urinating.[135] Two days later, he filed another request with Scott repeating his prior complaints of pain, as well as stating that the pain and swelling had increased and that he was suffering from "deformities."[136]

On December 10, 2019, Carilli filed an IRF with Fuller to ask again whether his left knee, right leg, left index finger, and back had been added to the orthopedic specialist referral, to which Fuller responded in the affirmative on December 26, 2019.[137]

On December 27, 2019, Carilli finally had an appointment with the orthopedic specialist at the UConn Health Center, Dr. John Connors.[138] But Dr. Connors informed Carilli that he had only been approved to treat Carilli's left knee, not his left index finger, right ankle, or back, and refused to treat these parts of Carilli's body.[139]

Two days later, on December 29, 2019, during a visit with RN Kimberly Leslie, Carilli explained what had happened during the appointment with Dr. Connors and asked that his right leg and back be examined.[140] RN Leslie referred Carilli to see a physician.[141]

---

[133] *Id.* at 28 (¶ 127).
[134] *Id.* at 28 (¶ 128).
[135] *Id.* at 28 (¶ 129).
[136] *Id.* at 28 (¶ 130).
[137] *Id.* at 28 (¶ 131).
[138] *Id.* at 28-29 (¶ 132).
[139] *Ibid.*
[140] *Id.* at 29 (¶ 133).
[141] *Ibid.*

The next day, on December 30, 2019, Carilli filed an IRF with Scott to ask why his left index finger was not included in the referral to Dr. Connors, and he repeated his request that Scott file a URC request for a urology appointment.[142] Carilli also submitted a separate IRF with defendants Dr. Kennedy, Furey, and Cyr, with complaints about how his issues were not being adequately addressed by the grievance system or the approvals of specialist appointments.[143]

On January 1, 2020, Carilli filed an IRF with Fuller asking why his tibia/fibula, left index finger, and lumbar spine issues were not included in the orthopedic referral request that resulted in Carilli's appointment with Dr. Connors.[144] Fuller responded two days later on January 3, 2020, that Carilli needed to be evaluated by defendant Dr. Johnny Wright.[145]

On January 5, 2020, Carilli gave an IRF to Nurse Stephanie Tittarelli during an appointment, in which Carilli complained his "left index finger [was] still painful," and that he was experiencing frequent urination, urinary leakage, difficulty urinating, and back pain.[146] Carilli also complained about urinary leakage and re-raised his request for a consult with a urologist, and Nurse Tittarelli emailed Dr. Johnny Wright with Carilli's complaints.[147]

On January 19, 2020, Carilli had an appointment with Nurse Agnes Arhin, where he complained of knee pain.[148] Nurse Arhin noted that Carilli said he "had a steroid injection in the past with no effect."[149]

On January 20, 2020, Carilli filed an IRF with Dr. Johnny Wright that noted pain and

---

[142] *Id.* at 29 (¶ 134).
[143] *Id.* at 29 (¶ 135).
[144] *Id.* at 29-30 (¶ 136).
[145] *Ibid.*
[146] *Id.* at 30 (¶ 137).
[147] *Ibid.*
[148] *Id.* at 30 (¶ 138).
[149] *Ibid.*

edema in his right tibia/fibula, urinary seepage, and tightness in his back.[150] Carilli filed another

form with Fuller, asking, as Carilli alleges, "if 1) another appointment with the orthopedic

specialist had been scheduled, and 2) if his urology appointment referral had been approved."[151]

Fuller replied four days later on January 24, 2020, that the orthopedic referral had not been

scheduled and that, "The provider will have to see you to submit new ortho [URC request]," but

that "yes, there is one for urology."[152]

On January 26, 2020, with Nurse Mariya Zea, Carilli asked for an

increase in his prescribed pain medication due to the pain in his finger, and Nurse Zea referred

Carilli to see the DOC physician.[153]

On February 1, 2020, Carilli filed a grievance in which he requested that all orthopedic

referrals that previously been approved be rescheduled, to which Cyr replied on February 3, 2020

that "an appointment with your provider is necessary and has been requested."[154]

On February 5, 2020, Carilli filed an IRF with Fuller to ask whether the orthopedic

specialist appointment Scott had approved for Carilli's left finger, right tibia/fibula, left knee,

and back had been scheduled.[155] On March 5, 2020, Fuller "responded by explaining that

Defendant Scott had asked him to schedule the orthopedic referral for [Carilli] to include the

listed items, but that he—Defendant Fuller—had failed to send the update to UConn before

[Carilli's] appointment," and writing "I apologize about my mistake I made."[156]

---

[150] *Id.* at 30 (¶ 139).
[151] *Id.* at 30 (¶ 140).
[152] *Ibid.*
[153] *Id.* at 30 (¶ 141).
[154] *Id.* at 30-31 (¶ 142).
[155] *Id.* at 31 (¶ 143).
[156] *Ibid.*

20

On February 6, 2020, during an appointment with Nurse Donna Marie Huff, Carilli complained of pain in his left knee. Nurse Huff referred Carilli to the DOC physician.[157]

On February 18, 2020, in response to a grievance Carilli had filed on December 1, 2019, defendant Cyr wrote, "[Y]ou have been approved for a urology appointment related to your prostate issues," but no appointment took place.[158]

On February 24, 2020, Carilli had an appointment with Dr. Ashmanie Mahatoo, a neurologist at UConn Health Outpatient Services.[159] Dr. Mahatoo documented Carilli's complaint of "persistent sharp right foot pain 'for the past 2 years'" and "occasional swelling in the foot that 'makes the pain worse.'"[160] Dr. Mahatoo also noted "nerve impingement secondary to remote [tibia/fibula] fracture," and recommended an X-ray of Carilli's right foot.[161] In addition, Dr. Mahatoo referred Carilli for a podiatry consultation.[162]

Three days later during an appointment on February 27, 2020, defendant Bianchi noted Carilli's complaints of "orthopedic pain" and said that she would request an orthopedic referral "for all of [Carilli's] complaints," including his "spine, knees and finger."[163] On March 6, 2020, Carilli filed an IRF with Fuller to ask whether Bianchi's referral had been fulfilled, to which Fuller replied six days later that it had not yet been scheduled.[164] That same day, Carilli filed another request with Fuller to see if the appointment had been scheduled, to which Fuller replied on March 13, 2020, writing "I emailed [Scott] to remind her about submitting UR. She said she

---

[157] *Id.* at 31 (¶ 144).
[158] *Id.* at 31 (¶ 145).
[159] *Id.* at 31 (¶ 146).
[160] *Ibid.*
[161] *Ibid.*
[162] *Ibid.*
[163] *Id.* at 32 (¶ 147).
[164] *Id.* at 32 (¶ 149).

was going to do it."[165]

On March 4, 2020, in a letter to Carilli, Furey noted "poor processing of [Carilli's] requests over time and lack of response from the provider level."[166]

On April 9, 2020, defendant Bombard ordered an X-ray of Carilli's right foot and ankle, which showed "deformities of the distal tibial and fibular shafts" and "plantar and Achilles enthesophytes," that is, "abnormal bone spurs."[167] Bombard signed the X-ray reports on April 13, 2020.[168]

On April 21, 2020, Carilli saw defendant Dr. Carson Wright, a primary care physician at Osborn.[169] Despite Carilli's reports of pain in his left finger, Dr. Carson Wright did not treat Carilli's pain, telling Carilli that he would, as Carilli alleges, "only treat three complaints at a time during a visit."[170]

On May 6, 2020, Carilli filed an IRF with Dr. Johnny Wright with a request for a referral to an orthopedic specialist due to the pain, swelling, and deformity in Carilli's left index finger, back, tibia/fibula, and left knee and asking why the urology appointment was not yet scheduled.[171] Dr. Johnny Wright replied to Carilli on May 13, 2020, stating that Carilli had already been seen by Dr. Carson Wright, and that Carilli's "issues on the back of this form were addressed."[172]

That same day, on May 13, 2020, Carilli had another appointment with Dr. Carson

---

[165] *Id.* at 32 (¶ 150).
[166] *Id.* at 32 (¶ 148).
[167] *Id.* at 32 (¶ 151).
[168] *Ibid.*
[169] *Id.* at 32 (¶ 152).
[170] *Ibid.*
[171] *Id.* at 33 (¶ 153).
[172] *Id.* at 33 (¶ 155).

Wright, who evaluated Carilli's finger, lumbar spine, and left knee edema.[173] Dr. Carson Wright also agreed to refer Carilli to an orthopedic specialist.[174]

On June 4, 2020, Carilli filed an ARF requesting a review of the various grievances he had filed between January 1, 2019 and May 30, 2020 in order to certify violations of AD 8.9.[175] On June 30, 2020, defendant Beckford replied that this grievance was "compromised" and that "[t]he level of investigation you are requesting is not necessary for your said resolution."[176]

Carilli had another appointment with Dr. Carson Wright on June 26, 2020, in which he documented that Carilli "has new back pain" and "PPT placed for back, left second digit," but did not do anything else to treat Carilli's pain.[177]

During an appointment on July 5, 2020, defendant Charles documented that Carilli has "longstanding musculoskeletal issues to his left knee, left index, back, and right tibia/fibula, and has requested a follow-up on consult to see ortho."[178]

On July 13, 2020, Carilli had a specialist visit with Dr. Hussain Nighat, a podiatrist at the UConn Health Outpatient Clinic. Dr. Nighat noted Carilli's complaint of pain in his right ankle over "several months," looked at earlier X-rays of Carilli's right foot and ankle, and ultimately diagnosed Carilli with a "compression neuropathy of the right lower extremity," which Carilli alleges is a "painful injury to a nerve caused by prolonged and untreated pressure on that nerve."[179]

---

[173] *Id.* at 33 (¶ 154).
[174] *Ibid.*
[175] *Id.* at 33 (¶ 156).
[176] *Ibid.*
[177] *Id.* at 33 (¶ 157).
[178] *Id.* at 33 (¶ 158).
[179] *Id.* at 33-34 (¶ 159).

On July 18, 2020, Carilli filed an IRF with Charles seeking an MRI on Carilli's left knee and right tibia/fibula.[180]

Three days later, on July 21, 2020, during an appointment with Dr. Carson Wright, the doctor declined to review Carilli's pain medication but did note Carilli's "back pain" and "left knee pain."[181]

Carilli finally had an appointment with Dr. Peter Albertsen, a urology specialist, at UConn Health CMHC Outpatient Services on August 4, 2020.[182] Dr. Albertsen noted Carilli's complaints, including urinary frequency; "nocturia," that is, nocturnal incontinence; and "voiding issues."[183] Carilli also underwent a physical exam, which revealed a "small prostate," and Dr. Albertsen noted that he "doubt[s] that [Carilli] has a significant bladder outlet obstruction."[184] Dr. Albertsen instead believed that Carilli's urinary issues may have been caused by "a neurologic issue related to his back."[185] Carilli alleges that his urinary issues "have been caused and/or exacerbated by the Defendants' repeated failures and delays in diagnosing and treating his ongoing complaints of pain in his back and lower extremities, and in referring him to appropriate specialists for diagnosis and/or treatment of the same."[186]

On August 18, 2020, during an appointment with defendant Sullivan, Carilli asked for "multiple MRIs to be done for evaluation of his areas of pain / left and right knee, left second finger, low back and feet."[187] Sullivan also noted Carilli's assertion that "despite Lyrica, his pain

---

[180] *Id.* at 34 (¶ 160).
[181] *Id.* at 34 (¶ 161).
[182] *Id.* at 34 (¶ 162).
[183] *Ibid.*
[184] *Ibid.*
[185] *Ibid.*
[186] *Id.* at 34 (¶ 163).
[187] *Id.* at 34-35 (¶ 164).

is chronic, constant, sharp and at least 7/10 in all areas above."[188]

On August 6, 2020, Carilli sought administrative review for why his "orders for treatment were not being scheduled" and "why there were numerous failures scheduling URCs/PPTs."[189] Cyr replied on August 18, 2020 that Carilli's grievance was "compromised," and wrote that, "You were informed that some of your URCs would be submitted during appointments with providers during the specific timeframe mentioned that were not entered."[190]

Carilli appealed Cyr's decision on August 22, 2020, and Furey responded to the appeal on September 2, 2020, again stating that the grievance was "compromised" and writing, "There may have been some PPT appointments that were not completed due to the provider leaving but I have ensured that a new provider see you and thoroughly address <u>all</u> of your concerns today."[191]

To prepare for the scheduled physical exam on September 2, 2020, Carilli filed an IRF with Cyr on August 31, 2020, in which Carilli included an index of his prior requests for treatment, with "detailed illustrations designed to demonstrate the sources of [Carilli's] pain and complaints in the relevant areas of his body."[192] Carilli alleges that he intended that "these document be used to guide his treatment during the 9/2/20 physical examination."[193] Cyr acknowledged receipt of the document.[194]

During the physical exam appointment on September 2, 2020, Sullivan and Cyr noted Carilli's "orthopedic pain / extensive history of orthopedic pain and disability, including

---

[188] *Ibid.*
[189] *Id.* at 35 (¶ 165).
[190] *Ibid.*
[191] *Ibid.* (emphasis in original).
[192] *Id.* at 35 (¶ 166).
[193] *Ibid.*
[194] *Ibid.*

previous spine surgery, severe arthritis of left knee, right hip, and knee pain, bilateral foot pain."[195]

On October 19, 2020, Carilli filed an IRF with Sullivan, writing that "the pain level and amount of time my right leg gives out have both increased. . . . The progression has rose to emergency intervention . . . . This is a serious need. Please see me ASAP."[196]

Carilli alleges that he has not had a "follow-up appointment with a specialist in neurology or neurosurgery to evaluate and treat [the] pain in his lumbar spine, his left knee, or his urinary incontinence" since 2016.[197] Carilli also alleges that he has not had an appointment with an orthopedic specialist to "evaluate and treat pain in his lumbar spine, his right ankle, or his left index finger," and that he has not seen a specialist for the pain in his left knee since his appointment with Dr. Connors in December 2019.[198] According to Carilli, he "continues to experience severe, constant, daily pain in each of these areas of his body."[199]

### *Failure to dispense prescribed Tylenol #3*

Carilli's next set of allegations deal with certain defendants' alleged failure to dispense the Tylenol #3 that Carilli was prescribed in 2016 for his pain. On June 30, 2017, Furey sent an email to staff, writing, "Tylenol 3 will now be considered non-formulary for any script written over 2 weeks. . . . Lyrica is being removed from the formulary as it is very expensive and there is no concrete evidence that it works any better than gabapentin."[200] More than a month later, on

---

[195] *Id.* at 35-36 (¶ 167).
[196] *Id.* at 36 (¶ 168).
[197] *Id.* at 36 (¶ 169).
[198] *Id.* at 36 (¶ 170).
[199] *Id.* at 36 (¶ 171).
[200] *Id.* at 36 (¶ 172).

August 11, 2017, Carilli filed an IRF with Furey, noting that he had stopped receiving his "T3" and requesting that his prescription be renewed.[201] Furey responded on August 22, 2017, but only noted that Carilli would have a doctor's appointment the next month.[202]

On August 11, 2017, Carilli also filed an IRF with Dr. Breton, asking him to "reinstate" the Tylenol #3 prescription "because it worked best with the Lyrica to manage [Carilli's] pain."[203] Dr. Breton responded on September 7, 2017, denying the request and instead telling Carilli that he intended to try an "alternative plan."[204] On August 21, 2017, Carilli filed an ARF seeking the reinstatement of his Tylenol #3 prescription, and received a response on September 20, 2017, stating that Carilli was "scheduled to see Dr. Breton regarding pain management."[205] On August 28, 2017, Carilli filed another IRF with Dr. Breton, stating that his pain had increased since his Tylenol #3 prescription was ended and asking for an appointment with Dr. Breton, to which Dr. Breton replied on August 31, 2017, that Carilli had "multiple upcoming appointments."[206]

On October 5, 2017, Dr. Breton renewed Carilli's prescription order for Tylenol #3, twice a day, for ninety days.[207] Nevertheless, a week later on October 12, 2017, Carilli stopped receiving Tylenol #3.[208] Carilli filed an ARF that day asking for Tylenol #3.[209] The next day, October 13, 2017, Carilli also filed an IRF with Furey, seeking Tylenol #3.[210] Furey replied four

---

[201] *Id.* at 36-37 (¶ 173).
[202] *Ibid.*
[203] *Id.* at 37 (¶ 174).
[204] *Ibid.*
[205] *Id.* at 37 (¶ 175).
[206] *Id.* at 37 (¶ 176).
[207] *Id.* at 37 (¶ 177).
[208] *Ibid.*
[209] *Id.* at 37 (¶ 178).
[210] *Id.* at 37-38 (¶ 179).

days later on October 17, 2017, noting that while "Dr. Breton did request T3 for you," "Dr. Farinella did not approve it. There is nothing more I can do about this."[211] Carilli alleges that Furey was referring to Dr. Monica Farinella, who worked for CMHC at the time and was also a member of the URC.[212] Carilli filed an IRF with Dr. Farinella on October 18, 2017, asking her to reinstate his Tylenol #3 prescription.[213] Dr. Farinella responded the next day that "[t]he T3 was not helping because of constipation."[214]

Almost two years later, on September 6, 2019, Carilli filed an IRF with Rodney, noting that according to his 2016 neurosurgery records, he had been prescribed Baclofen, Lyrica, muscle rubs, Naproxen, Elavil, and Tylenol #3.[215] Carilli requested the muscle rubs, Naproxen, Elavil, and Tylenol #3, stating it was "no wonder I am in so much pain" without them.[216] Rodney replied to Carilli on September 10, 2019, that he would address the issue on the next clinic visit.[217]

Almost two weeks later, on September 23, 2019, Carilli filed an ARF again stating that it was "no wonder my pain has increased," and asking that he be given a "narcotic to replace the Tylenol #3 I have not been receiving."[218] On November 7, 2019, Cyr responded, stating that Carilli would be "continuing his current medications."[219] Carilli appealed Cyr's response the next day, again requesting a "narcotic to replace the Tylenol #3 I have not been receiving," and

---

[211] *Ibid.*
[212] *Ibid.*
[213] *Id.* at 38 (¶ 180).
[214] *Ibid.*
[215] *Id.* at 38 (¶ 181).
[216] *Ibid.*
[217] *Ibid.*
[218] *Id.* at 38 (¶ 182).
[219] *Ibid.*

received a response from Scott on November 22, 2019, stating that "no provider will be able to deal with all his health demands in one encounter" and asking Carilli to be patient.[220]

Carilli alleges that to this date he has not received Tylenol #3 or an alternative narcotic, and that he continues to suffer with pain on a daily basis.[221] Instead, defendants have referred Carilli to a pain management specialist, but Carilli alleges he has not yet been scheduled for an appointment with one, nor has he seen one.[222]

### Opening Lyrica capsules

Carilli's third set of allegations deal with certain defendants' alleged practice of opening his Lyrica capsules against the manufacturer's recommendations. Carilli alleges that in the summer of 2018 he noticed that his Lyrica dosage, which normally came in the form of a capsule, had instead been opened by DOC staff and then re-assembled.[223] Carilli asserts that this practice "resulted in the loss of some of the medication" and that he "could not be sure exactly what actual dosage of the medication he was receiving after the capsules had been opened and resealed."[224] While UConn CMHC Medication Administration Policy No. D 2.19 states that medication in tablet form "shall be crushed prior to administration," Carilli asserts that this policy does not apply to Lyrica because it comes in capsule form, not tablet form.[225]

Carilli began to file IRFs in August and September 2018 with Furey and Dr. Ashraf, requesting that his Lyrica capsules not be opened as this resulted in the loss of medication and

---

[220] *Id.* at 38-39 (¶ 183).
[221] *Id.* at 39 (¶¶ 185, 188).
[222] *Id.* at 39 (¶¶ 186-87).
[223] *Id.* at 39 (¶ 189).
[224] *Ibid.*
[225] *Id.* at 39-40 (¶ 190).

was against the manufacturer's recommendations.[226] The responses he received stated that the capsules were opened according to policy and under Furey's instructions, and that this practice would continue.[227]

On January 7, 2019, Carilli asked Dr. Ashraf to order that the Lyrica capsules should not be opened, but Dr. Ashraf told Carilli that the capsules "must be opened according to a 'pharmacy rule.'"[228]

On April 15, 2019, Carilli filed an ARF, writing, "My Lyrica capsules are being opened depriving me of the prescribed dose, creating excessive pain."[229] On April 25, 2019, Cyr responded to Carilli, stating that he had to speak with a provider regarding this issue.[230] Two days later, Carilli appealed Cyr's decision.[231] Furey responded to the appeal on May 15, 2019, informing Carilli that his prescribed dose had been increased to a 300 mg daily total, to be taken three times a day, an increase from a 200 mg daily total, to be taken twice a day.[232] Still, Carilli's Lyrica capsules continued to be opened before being dispensed to Carilli.[233]

On April 23, 2019, after writing to Pfizer, who manufactures Lyrica, about whether opening the capsules was approved by Pfizer, Carilli received a response from Pfizer, stating, in part, "Lyrica is not approved for the use as opened capsules" and that "Pfizer does not suggest or recommend its use in this manner."[234]

---

[226] *Id.* at 40 (¶ 191).
[227] *Ibid.*
[228] *Id.* at 40 (¶ 192).
[229] *Id.* at 40-41 (¶ 194).
[230] *Ibid.*
[231] *Ibid.*
[232] *Ibid.*
[233] *Id.* at 41 (¶ 195).
[234] *Id.* at 40 (¶ 193).

On February 27, 2020, at a Health Service Review appointment with Bianchi, Carilli complained about continuing pain, and Bianchi increased Carilli's prescription of Lyrica to 400 mg per dose, administered twice daily, but did not order that Carilli's Lyrica capsules remain unopened.[235] Carilli alleges that this new dosage "exceeds the manufacturer's recommended maximum daily dose of Lyrica."[236] According to Carilli, DOC medical staff continue to open his prescribed Lyrica capsules and maintain his dosage at 400 mg per dose, twice a day.[237] Carilli believes that this practice endangers his health and safety.[238]

### *Delay in dispensation of medications*

Carilli's final set of allegations deal with an alleged failure to dispense his medications on time. While incarcerated at Osborn, Carilli received his medications by standing in a medication line at set times each day: 7:30am, 2pm, and 7:30pm.[239] Carilli asserts that, despite this policy, "DOC employees repeatedly failed to dispense [Carilli's] pain medication on time, as prescribed, and/or failed to distribute certain doses entirely, causing [Carilli] increased pain as he had to wait for his prescribed pain medication."[240] Carilli filed an IRF on July 23, 2017, complaining of these issues, noting that he often had to wait until 9:00pm or 9:30pm before receiving his medications.[241] Furey replied to Carilli four days later that "the law allowed them to provide medications within one hour of the prescribed dispensation time."[242]

On August 1, 2019, Carilli received a "medication pass" which allowed him to receive

---

[235] *Id.* at 41 (¶ 196).
[236] *Ibid.*
[237] *Id.* at 41 (¶ 197).
[238] *Ibid.*
[239] *Id.* at 41-42 (¶ 198).
[240] *Id.* at 42 (¶ 199).
[241] *Id.* at 42 (¶ 200).
[242] *Ibid.*

medications at "AM, 2 PM, HS," which Carilli asserts meant "7:30 AM, 2:00 PM, and 7:30 PM."[243] Despite receiving this pass, Carilli alleges that there have been at least twelve specific instances in 2019 and 2020, among others, in which the medication line was either out of certain medications, or that his medications were administered late or were denied.[244] Carilli asserts that when this occurred, he experienced symptoms including pain, muscle spasms, and discomfort.[245] Carilli alleges that he has repeatedly complained about these issues to DOC employees, including on at least seven occasions in 2019 and 2020, through oral complaints to a nurse, filing IRFs and ARFs, and appealing denials of those filings.[246] At least some of these complaints were directed to or were responded to by defendants Furey, Cyr, Cook, Gallagher, and Dr. Kennedy.[247]

Carilli alleges that when he either misses a dose or receives it late, he "experiences jittery sensations, breaks into a sweat, and his pain increases substantially," and that if he misses a dose, he "often loses control of his pain and it will take one or two more days of timely administration of his pain medication before his pain is under control again."[248] Carilli further alleges that defendants have not "created any plan that allows [Carilli] to receive his pain medications in a timely manner on a daily basis, and thereby prevent his increases in pain, discomfort, and muscle spasms caused by a delay in receiving his prescribed pain medication doses."[249] Nor have defendants developed a plan to get Carilli's medications to him on days he cannot go to

---

[243] *Id.* at 42 (¶ 201).
[244] *Id.* at 42-43 (¶ 202).
[245] *Ibid.*
[246] *Id.* at 43-44 (¶ 203).
[247] *Ibid.*
[248] *Id.* at 44 (¶ 204).
[249] *Id.* at 44 (¶ 206).

medication line at the usual time because he is at medical appointments at the UConn Health Center or at a URC meeting.[250]

### *Carilli's legal claims*

Carilli brings six claims under § 1983, all centered around allegations that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment or violated his right to procedural due process under the Fourteenth Amendment.

Carilli's first claim alleges that certain defendants were deliberately indifferent to his serious medical needs, by failing to treat or refer his orthopedic and neuropathic pain to specialists or provide him with adequate medical care.[251] Carilli's second claim is essentially a supervisory liability claim against certain defendants for these same acts.[252]

Carilli's third claim alleges that certain defendants were deliberately indifferent to his serious medical needs by "failing to provide [Carilli] with constitutionally adequate medical care for his extreme and prolonged pain and nerve injury," including adequate medication and protection from harm.[253] Carilli's fourth claim is essentially a supervisory liability claim against certain defendants for these same acts.[254]

Carilli's fifth claim alleges that certain defendants violated his right to procedural due process under the Fourteenth Amendment by "following [ADs] 8.9 and 9.6 in seeking to address his complaints regarding constitutionally inadequate healthcare," alleging that these procedures to seek review and appeal of his complaints regarding his allegedly inadequate medical care were

---

[250] *Id.* at 44-45 (¶ 207).
[251] *Id.* at 45-46 (¶¶ 208-12).
[252] *Id.* at 46 (¶¶ 213-16).
[253] *Id.* at 46-47 (¶¶ 217-21).
[254] *Id.* at 47-48 (¶¶ 222-25).

constitutionally inadequate.[255] Carilli's sixth claim is essentially a supervisory liability claim against certain defendants for these same acts.[256]

Carilli seeks compensatory and punitive damages and an injunction directing defendants to "provide (a) timely medical treatment, (b) timely medication distribution, (c) timely specialist referrals to treat the plaintiff's ongoing complaints of orthopedic pain and urinary incontinence, and (d) provide an adequate administrative remedy process to address the plaintiff's complaints of inadequate medical care."[257]

DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

---

[255] *Id.* at 48-49 (¶¶ 226-29).
[256] *Id.* at 49-50 (¶¶ 230-33).
[257] *Id.* at 50.

34

### *Deliberate indifference*

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. "An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on such a claim, a plaintiff must prove that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122. This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

As for the subjective prong, in the Second Circuit, "[a]llegations of delayed medical care may support a finding of deliberate indifference to a serious medical need, and allegations that delayed treatment resulted in serious harm may bear on the reasonableness of an inference of a defendant's knowledge of the risks to which he or she subjected the plaintiff." *Dotson v. Fischer*,

35

613 F. App'x 35, 39 (2d Cir. 2015).[258] Under this prong, the "charged officials must be subjectively reckless in their denial of medical care," that is, they must "act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 280) (emphasis in original). They "need only be aware of the risk of harm, not intend harm." *Ibid.*

But "[m]edical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703). Indeed, the level of recklessness required to meet the subjective prong is more than mere negligence. *See Salahuddin*, 467 F.3d at 280. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Ibid.* Indeed, "[i]t has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill*, 657 F.3d at 123.

Carilli has also alleged multiple claims against various defendants for "supervisory liability." The Second Circuit has recently clarified the standard for supervisory liability and ruled that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)

---

[258] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

(quoting *Iqbal*, 556 U.S. at 676). Thus, for Eighth Amendment deliberate indifference claims, "the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* at 616. Carilli must therefore establish that each defendant acted with deliberate indifference, that is, that each defendant "personally knew of and disregarded an excessive risk to [Carilli]'s health or safety." *Id.* at 619.

Because Carilli alleges multiple instances of deliberate indifference across different defendants, I will consider Carilli's sets of allegations and claims separately.

### *Requests for treatment and referrals to specialists*

Carilli first makes a series of allegations against various defendants for the failure to treat his orthopedic and neuropathic pain or to refer him to specialists. Carilli alleges that the delay in treatments and referrals have resulted in ongoing pain and exacerbation of his issues. Because Carilli asserts that he has experienced ongoing pain as a result of his conditions and because this pain and his conditions significantly affect his daily activities, I will assume without deciding for the purposes of initial review that Carilli has a serious medical need sufficient to satisfy the objective prong of the deliberate indifference standard.

As for the subjective prong, Carilli brings this claim against almost all named defendants—Furey, Dr. Breton, Dr. Kennedy, Gallagher, Dr. Ashraf, Rodney, Dr. Johnny Wright, Fuller, Scott, Bianchi, Dr. Carson Wright, Sullivan, Cyr, Dr. Freston, Bombard, Charles, and Beckford—and brings a separate, related claim for supervisory liability against defendants Semple, Cook, Quiros, Dr. Breton, Dr. Kennedy, Furey, and Gallagher. As I noted previously, in the Second Circuit there is no special rule for supervisory liability. Carilli must allege sufficient facts to establish that each defendant personally knew of and disregarded an excessive risk to his

health or safety. Carilli's allegations are wide-ranging and cover a significant period of time, but they do not touch on each defendant equally. I will therefore consider each defendant separately.

### *Defendant Furey*

Carilli alleges that in November 2017, he filed an IRF with Furey, complaining of pain in his right ankle, back, and knee.[259] Over the course of 2019, Carilli filed several IRFs with Furey, complaining of various pains and conditions and requesting referrals for treatment with specialists.[260] Carilli asserts that Furey did not always take action to address these issues or only placed him on the "sick call" list and scheduled him for a DOC Health Services Review.[261] Carilli also complained to Furey that Rodney had "rushed me out of his office without going over" Carilli's complaints and had "shown no empathy for my situation concerning pain and such."[262] In August 2019, Furey emailed Rodney telling Rodney that he had to follow up inmate grievances with an appointment and document it, "[o]therwise, we are at fault."[263] In December 2019, Carilli filed an IRF with Furey, Dr. Kennedy, and Cyr, with complaints about how his issues were not being adequately addressed by the grievance system or the approvals of specialist appointments.[264] In March 2020, Furey wrote to Carilli in a letter, noting the "poor processing of [Carilli's] requests over time and lack of response from the provider level."[265] And in September 2020, Furey responded to one of Carilli's appeals explaining that "[t]here may have been some PPT appointments that were not completed due to the provider leaving but I have ensured that a

---

[259] *Id.* at 16 (¶ 77).
[260] *Id.* at 20, 22, 24 (¶¶ 95, 103, 109).
[261] *Id.* at 22, 24 (¶¶ 103, 109).
[262] *Id.* at 21 (¶ 98).
[263] *Id.* at 24 (¶ 110).
[264] *Id.* at 29 (¶ 135).
[265] *Id.* at 32 (¶ 148).

new provider see you and thoroughly address <u>all</u> of your concerns today."[266] Carilli has pleaded sufficient facts to allow his claim to go forward against Furey, namely on the basis of Furey's acknowledgment that he was aware Carilli's requests for referrals to specialists had been "poor[ly] process[ed]," and that he was aware of Rodney's failures yet failed to ensure that Carilli's complaints were properly addressed.

### *Defendant Dr. Breton*

Carilli alleges that in March and April 2017, he filed several IRFs with Dr. Breton regarding his pain and his urinary problems, alleging that at least one of the replies failed to address his concerns.[267] He otherwise does not make allegations against Dr. Breton on this claim. Carilli has failed to plead sufficient facts to show that Dr. Breton personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Dr. Breton.

### *Defendant Dr. Kennedy*

Carilli alleges that in December 2019, he filed an IRF with Dr. Kennedy, Furey, and Cyr with complaints about how his issues were not being adequately addressed by the grievance system or the approvals of specialist appointments.[268] While this allegation might demonstrate that Dr. Kennedy was aware of Carilli's ongoing problems, Carilli does not make any further allegations as to Dr. Kennedy's involvement or his response to Carilli's request. Carilli has failed to plead sufficient facts to show that Dr. Kennedy personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Dr.

---

[266] *Id.* at 35 (¶ 165). (emphasis in original).
[267] *Id.* at 16 (¶¶ 74-75).
[268] *Id.* at 29 (¶ 135).

Kennedy.

### *Defendant Dr. Ashraf*

Carilli alleges that in multiple appointments in 2018, Dr. Ashraf did not treat his complaints of pain in various parts of his body, nor on one occasion did he make any referrals to a specialist.[269] During two appointments in August and October 2018, after Carilli complained of pain in certain body parts, Dr. Ashraf ordered X-rays and in one appointment increased Carilli's dosage of Baclofen.[270] In December 2018, Carilli filed an IRF with Dr. Ashraf complaining of edema and pain in his feet and requesting multiple MRIs, review by an orthopedic surgeon, a consultation with a neurologist, and a referral to a urologist.[271] In January 2019, during an appointment with Dr. Ashraf, Carilli asked to discuss his left index finger X-rays and treatment options and alleges that Dr. Ashraf failed to document Carilli's complaints about his finger but did document his complaints of pain in his lumbar spine and lower extremities.[272] Dr. Ashraf kept Carilli on his then-prescribed medications for pain and did not discuss any further treatment options or take additional actions to address Carilli's issues.[273] While Carilli has alleged that Dr. Ashraf did not treat his pain on multiple occasions, Carilli's allegations do not rise above the level of negligence or medical malpractice. Further, while Carilli does assert that he filed IRFs requesting referral to specialists, he does not sufficiently allege that Dr. Ashraf is responsible for any failure to submit these referrals or schedule appointments. Accordingly, I will dismiss this claim against Dr. Ashraf.

---

[269] *Id.* at 17-18 (¶¶ 80-84).
[270] *Id.* at 18 (¶¶ 83-84, 86).
[271] *Id.* at 19 (¶ 89).
[272] *Id.* at 19-20 (¶ 91).
[273] *Ibid.*

*Defendant Rodney*

Carilli alleges that Rodney failed over the course of 2019 on several different occasions to address Carilli's complaints of pain in various parts of his body and urinary issues or answer Carilli's requests for referrals to specialists.[274] Carilli filed a complaint in May 2019 about Rodney's failure to address his complaints or his request for a referral and complained that Rodney had "rushed me out of his office without going over" the complaints and that Rodney had "shown no empathy for my situation concerning pain and such."[275] In late August 2019, Furey wrote to Rodney explaining that Rodney had to follow up grievance with appointments and documentation, and that Cyr had forwarded three grievances to Rodney—including one from Carilli. All three inmates who had filed these grievances had not yet been seen.[276] In September 2019, Rodney again failed to address Carilli's complaints of pain, although he agreed to schedule an examination with a urologist.[277] Near the end of September 2019, Carilli filed an IRF with Rodney asking him to stop delaying treatment and for a referral to a neurologist, and noting that Carilli had already told Rodney about his "multiple serious medical conditions."[278] Rodney replied a month later that an appointment was set.[279] By late October 2019, Rodney still had not booked a urology appointment that he had agreed to book during an appointment in early September.[280] Carilli has pleaded sufficient facts to allow his claim to go forward against Rodney, namely on the basis of Rodney's alleged repeated failure to schedule appointments

---

[274] *See, e.g.*, *id.* at 20-24 (¶¶ 92, 94, 96, 99, 103, 105, 106, 109, 112).
[275] *Id.* at 21 (¶¶ 98-99).
[276] *Id.* at 24 (¶ 110).
[277] *Id.* at 24 (¶ 111).
[278] *Id.* at 25 (¶ 115).
[279] *Ibid.*
[280] *Id.* at 26 (¶ 118).

and/or referrals despite his awareness of Carilli's ongoing pain and conditions.

### Defendant Dr. Johnny Wright

Carilli alleges that he filed an IRF in January 2020 with Dr. Johnny Wright, complaining of pain and edema in his right tibia/fibula, urinary seepage, and tightness in his back.[281] But he does not specify what response, if any, he received. Carilli filed another IRF with Dr. Johnny Wright in May 2020, requesting a referral to an orthopedic specialist and asking why his urology appointment was not yet scheduled.[282] Dr. Johnny Wright replied that same month that Carilli had already been seen by Dr. Carson Wright, and that Carilli's "issues on the back of this form were addressed."[283] Carilli's allegations against Dr. Johnny Wright do not rise above the level of negligence or medical malpractice. Accordingly, I will dismiss this claim against Dr. Johnny Wright.

### Defendant Fuller

Carilli alleges that Scott told Fuller in November 2019 to document Carilli's "URC (PPT)" requests to include an orthopedic referral for Carilli's left index finger, right tibia/fibula, and back, in addition to his left knee.[284] In December 2019, Carilli filed an IRF with Fuller to ask whether his left knee, right leg, left index finger, and back had been added to the orthopedic specialist referral, to which Fuller responded in the affirmative.[285]

In January 2020, Carilli asked Fuller why his tibia/fibula, left index finger, and lumbar spine issues were not included in the orthopedic referral request that led to his appointment with

---

[281] *Id.* at 30 (¶ 139).
[282] *Id.* at 33 (¶ 153).
[283] *Id.* at 33 (¶ 155).
[284] *Id.* at 28 (¶ 127).
[285] *Id.* at 28 (¶ 131).

Dr. Connors.[286] Fuller responded that Carilli needed to be evaluated by Dr. Johnny Wright.[287] That same month, Carilli asked Fuller "if 1) another appointment with the orthopedic specialist had been scheduled, and 2) if his urology appointment referral had been approved."[288] Fuller replied that the orthopedic referral had not been scheduled and that "[t]he provider will have to see you to submit new ortho [URC request]," but that "yes, there is one for urology."[289]

In February 2020, Carilli asked Fuller whether the orthopedic specialist appointment Scott approved for Carilli's left finger, right tibia/fibula, left knee, and back had been scheduled.[290] In early March 2020, Fuller "responded by explaining that Defendant Scott had asked him to schedule the orthopedic referral for [Carilli] to include the listed items, but that he—Defendant Fuller—had failed to send the update to UConn before [Carilli's] appointment," writing, "I apologize about my mistake I made."[291] The next day, Carilli asked Fuller whether Bianchi's orthopedic referral had been fulfilled, to which Fuller replied six days later that it had not yet been scheduled.[292] That same day, Carilli filed another request with Fuller to see if the appointment had been scheduled, to which Fuller replied: "I emailed [Scott] to remind her about submitting UR. She said she was going to do it."[293] Although Carilli has alleged facts that might arguably be enough to establish a claim for negligence against Fuller, he has not alleged enough facts to show that Fuller was deliberately indifferent. Accordingly, I will dismiss Carilli's claim against Fuller.

---

[286] *Id.* at 29-30 (¶ 136).
[287] *Ibid.*
[288] *Id.* at 30 (¶ 140).
[289] *Ibid.*
[290] *Id.* at 31 (¶ 143).
[291] *Ibid.*
[292] *Id.* at 32 (¶ 149).
[293] *Id.* at 32 (¶ 150).

*Defendant Scott*

Carilli alleges that he filed an IRF in November 2019 with Scott, asking her to review his previous IRFs in 2018 and 2019 regarding the pain in his right leg.[294] That same month, Carilli had an appointment with Scott where Scott agreed to submit a referral to an orthopedic specialist for the pain in Carilli's left finger but did not address Carilli's urinary issues.[295] The day after that appointment, Carilli filed an IRF with Scott stating that there had not been enough time during the appointment to address all of his issues and asked whether certain referrals had been made, to which he received no response.[296] Carilli filed a similar IRF with Scott a few days later.[297] During an appointment with Scott on November 19, 2019, Carilli complained of pain in his right leg and urinary issues and asked for a urology referral.[298] Scott told Fuller that Carilli's "URC (PPT)" requests were to include an orthopedic referral for Carilli's left index finger, right tibia/fibula, and back, in addition to his left knee.[299] Carilli filed two more IRFs with Scott in December 2019 reiterating his urinary problems, his request for a urologist, and his ongoing pain.[300] Later that month, Carilli filed an IRF with Scott to ask why his left index finger was not included in his referral to Dr. Connors at the UConn Health Center and asked again for her to submit a URC request for a urology appointment.[301]

In March 2020, after Carilli filed an IRF with Fuller to see if an orthopedic referral appointment had been scheduled, to which Fuller replied that he had emailed Scott to remind her

---

[294] *Id.* at 26 (¶ 121).
[295] *Id.* at 27 (¶ 123).
[296] *Id.* at 27 (¶ 124).
[297] *Id.* at 27 (¶ 125).
[298] *Id.* at 28 (¶ 126).
[299] *Id.* at 28 (¶ 127).
[300] *Id.* at 28 (¶¶ 129-30).
[301] *Id.* at 29 (¶ 134).

to submit it and that Scott had said she was going to do it.[302] Carilli does not allege further facts against Scott or whether Scott was personally involved in any further failure in scheduling the March 2020 orthopedic referral appointment. Although Carilli has alleged facts that might arguably be enough to establish a claim for negligence against Scott, he has not alleged enough facts to show that Scott was deliberately indifferent. Accordingly, I will dismiss Carilli's claim against Scott.

### Defendant Bianchi

Carilli alleges that Bianchi noted Carilli's complaints of pain in February 2020 and told him that she would request an orthopedic referral "for all of [Carilli's] complaints," including his "spine, knees and finger."[303] The next month, Carilli filed an IRF with Fuller to ask whether Bianchi's referral had been fulfilled, to which defendant Fuller replied six days later that it had not yet been scheduled.[304] Carilli does not make any further allegations as to Bianchi's involvement or whether Bianchi had any personal involvement in the delay in scheduling the orthopedic appointment. Carilli has failed to plead sufficient facts to show that Bianchi personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Bianchi.

### Defendant Dr. Carson Wright

Carilli alleges that he saw Dr. Carson Wright in April 2020 and that Dr. Carson Wright did not treat Carilli's pain in his left finger, telling Carilli that he would "only treat three

---

[302] *Id.* at 32 (¶ 150).
[303] *Id.* at 32 (¶ 147).
[304] *Id.* at 32 (¶ 149).

complaints at a time during a visit."[305] Carilli had another appointment with Dr. Carson Wright in May 2020, where Dr. Carson Wright evaluated Carilli's finger, lumbar spine, and left knee edema and agreed to refer Carilli to an orthopedic specialist.[306] Carilli had a third appointment with Dr. Carson Wright in June 2020, where Dr. Carson Wright documented Carilli's complaints of pain but did not treat them.[307] Carilli finally alleges that during his July 2020 appointment with Dr. Carson Wright, the doctor declined to review Carilli's pain medication but did document Carilli's "back pain" and "left knee pain."[308] Because Carilli has alleged enough facts to establish plausible grounds to conclude that Dr. Carson Wright was deliberately indifferent to Carilli's serious needs, I will allow his claim to proceed against Dr. Carson Wright.

### *Defendant Sullivan*

Carilli alleges that he asked Sullivan in August 2020 for multiple MRIs and told Sullivan that he experienced "chronic, constant, sharp" pain.[309] Sullivan was also present for a physical exam in September 2020 with Cyr.[310] Finally, Carilli alleges that he filed an IRF with Sullivan in October 2020 complaining about the pain and asking Sullivan to see him "ASAP,"[311] but Carilli does not explain what Sullivan's response was, if any. Carilli has failed to plead sufficient facts to show that Sullivan personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Sullivan.

---

[305] *Id.* at 32 (¶ 152).
[306] *Id.* at 33 (¶ 154).
[307] *Id.* at 33 (¶ 157).
[308] *Id.* at 34 (¶ 161).
[309] *Id.* at 34-35 (¶ 164).
[310] *Id.* at 35-36 (¶ 167).
[311] *Id.* at 36 (¶ 168).

*Defendant Cyr*

Carilli alleges that, in August 2019 and in response to a complaint filed by Carilli claiming that Rodney had not made a decision on Carilli's request to see a neurologist, Cyr emailed Rodney, writing that Carilli "had requested a neurology follow up due to sharp shooting pains down his R leg and spontaneous loss of grip in his right hand," and asking Rodney whether he would be "submitting a [URC request] for this?"[312] Cyr wrote back to Carilli with Rodney's response that no URC request would be submitted "due to insufficient clinical data."[313] In response to a request Carilli submitted regarding his urinary problems, Cyr wrote that Rodney would "need more information regarding dribbling prior to any outside referral," and that he would "see in next clinic visit."[314] In October 2019, Cyr notified Carilli that he had an orthopedic appointment scheduled.[315] In November 2019, in response to Carilli's question of which conditions the orthopedic and neurologist referrals had been made for and whether they were approved, Cyr responded that Carilli's complaints were "being worked on" and asked Carilli to be patient.[316] That same month, in response to a request for a urology appointment, Cyr asked Carilli to "exercise some patience."[317]

In December 2019, Carilli submitted an IRF with Cyr, Dr. Kennedy, and Furey with complaints about how his issues were not being adequately addressed by the grievance system or the approvals of specialist appointments.[318] In February 2020, Cyr wrote that an appointment

---

[312] *Id.* at 23 (¶¶ 106-07).
[313] *Ibid.*
[314] *Id.* at 23 (¶ 108).
[315] *Id.* at 24-25 (¶ 113).
[316] *Id.* at 27 (¶ 122).
[317] *Id.* at 26 (¶ 118).
[318] *Id.* at 29 (¶ 135).

with the provider was required and requested in response to Carilli's request that all previously approved orthopedic referral be rescheduled.[319] In February 2020, Cyr wrote to Carilli that, "[Y]ou have been approved for a urology appointment related to your prostate issues," but no appointment took place.[320]

In August 2020, in response to a request from Carilli for administrative review as to why his "orders for treatment were not being scheduled" and "why there were numerous failures scheduling URCs/PPTs," Cyr wrote that, "You were informed that some of your URCs would be submitted during appointments with providers during the specific timeframe mentioned that were not entered."[321] In September 2020, Cyr was present during a physical exam of Carilli and noted Carilli's history of pain and various conditions.[322] Cyr also received a document from Carilli recounting his prior requests for treatment and his pain and complaints.[323] Carilli has pleaded sufficient facts to allow his claim to go forward against Cyr, namely on grounds that Cyr was aware not only of Carilli's painful conditions but also that Carilli's needs were not being addressed and yet failed to fix or respond to the problems with the system.

### *Defendant Bombard*

Carilli alleges that in April 2020, Bombard ordered an X-ray of his right foot and ankle.[324] Carilli does not make any further allegations as to Bombard's personal involvement. Carilli has failed to plead sufficient facts to show that Bombard personally knew of and

---

[319] *Id.* at 30-31 (¶ 142).
[320] *Id.* at 31 (¶ 145).
[321] *Id.* at 35 (¶ 165).
[322] *Id.* at 35-36 (¶ 167).
[323] *Id.* at 35 (¶ 166).
[324] *Id.* at 32 (¶ 151).

disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Bombard.

### Defendant Charles

Carilli alleges that during an appointment with Charles in July 2020, he requested a "follow-up on consult to see ortho."[325] Carilli also alleges that later that same month, he filed an IRF with Charles seeking an MRI on his left knee and right tibia/fibula.[326] Carilli does not make any further allegations as to Charles's personal involvement. Carilli has failed to plead sufficient facts to show that Charles personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Charles.

### Defendant Beckford

Carilli alleges that Beckford replied in June 2020 to one of Carilli's ARFs, seeking a review of other grievances Carilli had filed in 2019 and 2020.[327] Carilli alleges that Beckford replied that Carilli's grievance was "compromised" and that "[t]he level of investigation you are requesting is not necessary for your said resolution."[328] Carilli does not make any further allegations as to Beckford's personal involvement. Carilli has failed to plead sufficient facts to show that Beckford personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Beckford.

### Defendant Cook

Carilli alleges that he filed an IRF in October 2019 with defendants Cook, Furey,

---

[325] *Id.* at 33 (¶ 158).
[326] *Id.* at 34 (¶ 160).
[327] *Id.* at 33 (¶ 156).
[328] *Ibid.*

Rodney, Scott, Dr. Johnny Wright, and Cyr seeking a referral to an orthopedist, neurologist, and urologist.[329] Carilli received a response in January 2020 which he alleges "indicat[ed] that he had been approved to see multiple specialists but was 'waiting for scheduling.'"[330] Carilli does not make any further allegations as to Cook's involvement or his response to Carilli's request. Carilli has failed to plead sufficient facts to show that Cook personally knew of and disregarded an excessive risk to his health and safety. Accordingly, I will dismiss this claim against Cook.

### *Other defendants*

Carilli also includes Dr. Freston, Semple, Quiros, and Gallagher in his deliberate indifference claim based on the failure to treat his pain or refer him to a specialist, but Carilli makes no specific allegations of personal involvement by any of these defendants beyond conclusory allegations of a failure to supervise. Accordingly, I will dismiss this claim against Dr. Freston, Semple, Quiros, and Gallagher.

In summary, I will allow Carilli's deliberate indifference claim relating to the failure to treat or refer to go forward only against defendants Furey, Rodney, Dr. Carson Wright, and Cyr. The claim is dismissed as to all other defendants.

### *Failure to dispense prescribed Tylenol #3*

Carilli next alleges that certain defendants' failure to prescribe or reinstate his 2016 prescription for Tylenol #3 or, in the alternative, to prescribe another narcotic violated his Eighth Amendment rights. Carilli alleges that he was prescribed Baclofen, Lyrica, muscle rubs, Naproxen, Elavil, and Tylenol #3 in 2016.[331] Carilli alleges that he has also asked that he be

---

[329] *Id.* at 26 (¶ 119).
[330] *Ibid.*
[331] *Id.* at 38 (¶ 181).

given a "narcotic to replace the Tylenol #3 I have not been receiving,"[332] to which, defendant Cyr later responded that Carilli would be "continuing his current medications."[333]

The denial of pain medication may rise to the level of sufficient seriousness to satisfy the objective prong of the deliberate indifference standard in some circumstances. *See, e.g.*, *Walker v. Cty. of Nassau*, 2016 WL 11481725, at *9 (E.D.N.Y. 2016) (finding plaintiff's allegation that despite complying with the "'pain medication' protocol," he was "still in constant debilitating pain," was sufficient to satisfy the objective prong of the deliberate indifference standard). But Carilli's allegations of deliberate indifference by any particular defendant are lacking. He faults the defendants only for failing "to dispense Tylenol #3, or an alternative narcotic."[334] But he does not allege that he has been denied pain relief medication altogether; to the contrary, he acknowledges that Cyr told him that he "would be continuing his current medications."[335] Nor has Carilli alleged facts sufficient to show that the failure to dispense Tylenol #3 was the result of deliberate indifference, as distinct from a difference of opinion about the appropriate choice of medications for pain relief. *See Awad v. Univ. of Conn. Health Ctr.*, 2019 WL 109338, at *6 (D. Conn. 2019). Accordingly, I will dismiss his claims against all defendants insofar as they are premised on the alleged failure to dispense Tylenol #3.

### *Opening Lyrica capsules*

Carilli next alleges that certain defendants opened his Lyrica capsules against the manufacturer's recommendations and that he has been prescribed a new dosage of Lyrica that

---

[332] *Id.* at 38 (¶ 182).
[333] *Ibid.*
[334] *Id.* at 39 (¶ 185).
[335] *Id.* at 38 (¶ 182).

exceeds the manufacturer's recommended maximum daily dose. Allegations of crushing medication, even if against the manufacturer's recommendations, are not sufficient to state a deliberate indifference claim without plausible allegations of resulting harm. *See Turner v. Sidorowicz*, 2014 WL 641454, at *2, 9 (S.D.N.Y. 2014). While Carilli alleges that he received a response from Lyrica's manufacturer stating that Lyrica is not approved for use as opened capsules, Carilli alleges only that he believes these practices with his Lyrica medication endanger his health and safety. He has not alleged plausible facts to suggest that he has actually suffered harm. Accordingly, I will dismiss Carilli's deliberate indifference claim related to the Lyrica capsules.

### Delay in dispensation of medications

Carilli next alleges that certain instances in which his pain medication was either delayed or was denied over a period of years violated his Eighth Amendment rights. To evaluate his claim, I must first consider whether the deprivation of medical care in the form of delayed or denied pain medication is sufficiently serious. To be sufficiently serious, this deprivation must be one that may produce "death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122. Courts may also consider whether there is "the presence of a medical condition that significantly affects an individual's daily activities" or "the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702. The Second Circuit has further instructed that "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim."

52

*Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis in original).

Carilli alleges that, when he either misses a dose or receives it late, he "experiences jittery sensations, breaks into a sweat, and his pain increases substantially," and that if he misses a dose, he "often loses control of his pain and it will take one or two more days of timely administration of his pain medication before his pain is under control again."[336] He also alleges that as a result of missing or delayed medications, he experienced symptoms that include pain, muscle spasms, and discomfort.[337] Carilli further alleges that there have been at least twelve specific instances in 2019 and 2020, among others, in which the medication line was either out of certain medications, or that his medications were administered late or were denied.[338]

But "[c]ourts have held that denial of a single dose, or even several doses, of a needed medication is insufficient, without more, to establish a serious delay in treatment under the Eighth Amendment." *Schlosser v. Carter*, 2021 WL 1124280, at *9 (D. Conn. 2021) (collecting cases); *Constantino v. DiStefano*, 2020 WL 353094, at *5 (E.D.N.Y. 2020) (collecting cases); *see also Bilal v. White*, 494 F. App'x 143, 145 (2d Cir. 2012) (affirming grant of summary judgment on deliberate indifference claims where, "[a]lthough epilepsy and arthritis arguably are serious underlying conditions, the record evidence here, taken as true, demonstrates a temporary delay or interruption in the provision of otherwise adequate medical treatment for those ailments lasting only a few hours.").

Carilli's allegations are spread out over 2019 and 2020: medication denied on January 20, 2019, causing pain and tightness in his back; medication denied on January 24, 2019, causing

---

[336] *Id.* at 44 (¶ 204).
[337] *Id.* at 44 (¶ 206).
[338] *Id.* at 42-43 (¶ 202).

pain and tightness in his back; medication denied on October 3, 2019, causing back pain; medication delayed three hours on the morning of October 4, 2019, causing increased pain and muscle spasms; medication denied on the afternoon of December 27, 2019; medication denied on the morning of January 14, 2020, causing increased pain and muscle spasms; medication delayed one-and-a-half hours on the evening of January 16, 2020, causing increased pain and muscle spasms; medication delayed two-and-a-half hours on the morning of and denied on the afternoon of January 17, 2020, causing increased pain and discomfort; medication denied on the morning of March 10, 2020, causing increased pain and discomfort; medication denied on March 11, 2020; and medication delayed one-and-a-half hours on the morning of and on the evening of May 15, 2020, causing increased pain and muscle spasms.[339] These scattered instances of missed or delayed medications are not enough to support the objective prong of a serious medical need for an Eighth Amendment deliberate indifference claim.

Nor do the facts as pleaded plausibly support a showing that any of the defendants acted with a subjectively reckless state of mind with respect to the missed or delayed medications. For some of the specific instances described by Carilli, he refers to the "medication line" being out of a particular medication, and for other instances he alleges that he was denied medication but does not describe the circumstances or name who made the decision to deny him. Accordingly, I will dismiss Carilli's deliberate indifference claim as to the delay or denial of pain medications.

### *Procedural due process*

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const.

---

[339] Doc. #33 at 42-43 (¶ 202).

amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment protects both a right to "substantive" due process and "procedural" due process. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). A claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

Carilli alleges that the defendants "deprived" Carilli of his "right to procedural due process to address his serious medical needs *by following* the Administrative Directives 8.9 and 9.6 in seeking to address his complaints regarding constitutionally inadequate healthcare."[340] This amounts to a challenge that the procedures set forth for review of prisoner complaints are themselves unconstitutional. But this claim lacks merit because prisoners do not have a constitutional right to an effective grievance procedure in the first place. *See Cabassa v. Ostheimer*, 162 F. Supp. 3d 60, 63 (D. Conn. 2016). To the extent that Carilli's complaint may be understood to fault particular defendants for failing to follow prison grievance procedures, such claims lack merit because "[i]nmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, 2020 WL 127700, at *5 (D. Conn. 2020). Accordingly, I will dismiss Carilli's claims under the Due Process Clause.

CONCLUSION

In accordance with the foregoing, the Court enters the following orders:

(1) The deliberate indifference claim for failure to treat or refer shall go forward against

---

[340] Doc. #33 at 48 (¶ 227) (emphasis added).

defendants Rodney, Dr. Carson Wright, and Cyr in their individual capacities and against Furey in his official and individual capacity. All remaining claims and defendants are DISMISSED.

(2) The Clerk shall verify the current work addresses for the named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses within twenty-one (21) days of this Order, and report to the Court on the status of the waiver requests by not later than the thirty-fifth (35) day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(3) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal is directed to effect service of the Complaint on defendant Furey at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within twenty-one (21) days from the date of this Order and to file a return of service within thirty (30) days from the date of this Order.

(4) All defendants shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(5) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(6) The discovery deadline is extended to six months (180 days) from the date of this Order. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The

order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

Note that discovery requests should not be filed with the Court. In the event of a dispute over

discovery, the parties should make a good faith effort to resolve the dispute amongst themselves;

then, the parties should file the appropriate motion to compel on the docket.

(7) The deadline for summary judgment motions is extended to seven months (210 days)

from the date of this Order.

(8) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive

motion (i.e. a motion to dismiss or a motion for summary judgment) within twenty-one (21) days

of the date the motion was filed. If no response is filed, or the response is not timely, the Court

may grant the dispositive motion without further proceedings.

(9) If plaintiff changes his address at any time during the litigation of this case, Local

Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the

dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He

should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the

new address on a letter without indicating that it is a new address. If Plaintiff has more than one

pending case, he must indicate all of the case numbers in the notification of change of address.

Plaintiff must also notify defendants or defense counsel of his new address.

(10) Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the

Court. Plaintiff is advised that the Program may be used only to file documents with the Court.

As discovery requests are not filed with the Court, the parties must serve discovery requests on

each other by regular mail.

It is so ordered.

Dated at New Haven this 19th day of June 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge